May it please the Court, Shane Stevenson for Appellant Lorraine Campbell. For the record, Mr. Stevenson is a former clerk of mine. I will seek to reserve three minutes if if I'm able. In granting summary judgment, the court below made three errors, all of which are reviewed by this court de novo. First, the District Court mistakenly found that no special relationship existed between Justine Booth and the State of Washington when state actors caused her death in October of 2006. This despite evidence showing that not only was Justine's life, daily life, controlled by these state actors, but in fact they moved her without her consent and over the objection of her biological parent from one city to another in a state-operated home. Second, it erroneously failed to apply the danger-creation doctrine that is a clear exception, well-established and alluded to in De Cheney and well-established since 1989 and would be Ostrander in this circuit. Lastly, it erred in finding alternatively that the court could grant summary judgment on the basis of qualified immunity with respect to each of the appellees on the ground that the law in question was quote in flux. I know at the outset there's no argument by any of the appellees that with respect to the danger-creation exception, that there's any flux in that legal development. There's no defense that's been made in the record that that doctrine would be subject to a qualified immunity challenge. With respect to each of the question about whether she was at that home voluntarily, which wasn't really addressed, she was apparently somewhere else before, perhaps a more restrictive environment, and then she was voluntarily allowed to go to a less restrictive environment. Your Honor. Would she have been required to go back to the more restrictive requirement had she not wanted to remain in the less restrictive one, or would she have just walked out the door and gone home? I'll answer, there's two answers to that. First of all, from about the age of two, Justine was effectively a ward of the state, either in another state or this state. So you're going to see the sort of unfolding of a tragic story of this woman who, though eventually she attains the biological age of 33, is functionally, you know, the lowest one percentile of functioning persons in this country, who was found to be incapacitated by King County Superior Court in 1991. She was at Furcrest, which was a home for, it was a more age-appropriate and more controlled prior to her admission in the SOLA program, to which she applied in Her mother applied and she went into that program. By its terms, and we can look in the record to the participation letter that was dated April 17, 1990, that's at 1041 of the excerpts, and in that it says quite plainly, if you wish to leave this program at any time, you may contact the field services officer. Interestingly, at least one circuit, in the Third Circuit, the most recent Court of Appeals to look at this doctrine, has held that when there are that alone, in addition to other things, can constitute a sufficient restraint on your liberty. And of course, going back to language in DeShaney, I would challenge the characterization made by appellants of the doctrine, which I think is completely misunderstood, particularly by Appellees McGinty and Mitchell. Firstly, there is no categorical rule, and even the district court acknowledged that, that says outside of incarceration or what's traditionally considered institutionalized commitment, there is no other way that the state actor can be found to have deprived a person, under a 1983 analysis, of 14th Amendment substantive due process claims. You actually look at the case law, each of the circuits that the district court glossed over far too quickly and simplified far too easily. If you go systematically through each of those circuit decisions, you'll find there is, in fact, no per se rule articulated by any of those courts that says, we will not examine the facts on the ground. We will not look to the question whether actual restraints of liberty occurred. We will simply ask whether the initial admission to the program was voluntary and leave the analysis at that. The closest case for their proposition is the Walton case. None of the other cases hold that. Explicitly, Tariski and Schaefer go the opposite way and say, in fact, in Tariski, we're affirming a denial of qualified immunity on the grounds that, in fact, involuntary transfers, which we had here, to a new resident, can be found to constitute a sufficient restraint of liberty, even when the program was itself voluntary. Well, the next, that was my next question, which is, let's say that she didn't want to transfer to a different house. Could she, at that point, have left the program, rather than transferring to the different house, if she felt strongly about it? There's a bit of a... Walker Guardian did. Yes, Judge Walker, there's a bit of an anomaly here, because on the one hand, the appellees want to argue that, in fact, all of this is within the control of her mother, that her mother is, in fact, still calling the shots, even though, and setting aside a bit, this sort of interesting kind of collateral dispute as to whether she lost her guardianship over the estate and over the person. There's evidence in the record, in the Oborn Declaration, that as of 1995, when the state of Washington found that she, Ms. Campbell, had failed to no longer consider her her guardian, they didn't send her SOLA paperwork, she asked, and asked to participate in this sort of fateful 2006 meeting, which resulted in a modification of the protocol that sought to protect Justine, and I should say, parenthetically, ultimately relating in, ultimately resulting in the firing of two of these appellees and the severe reprimand of the third. They did not consider her to have that power. She objected to the move, when they moved her from Seattle to Kent, which is in South King County, her mother objected. They didn't care, because they controlled her at that point. This is a person with the mental functioning of a young child. She wasn't about to wake up one morning and say, you know, I'd really like to be somewhere else. So if you look to the Walton case in the Fifth Circuit, for example, which appellees most prefer. Interesting case there, the three judge panel held, there is a special relationship that's established. And in that case, it was a school for young children, a school for the deaf. It was a residential school. And in that case, the three judge panel held, there is a special relationship in a circumstance where, unfortunately, one of the children was assaulted by another. And then action was taken. The dean was alerted to that fact. And then the assault occurred again by the same child. So they challenged that. On Bonk, in a close vote, the majority on Bonk held, there's no special relationship, because this is a voluntary program, and the parents could have taken their kid out at any time. That's not the situation that we have here, first of all. I would say even further, though, that this court more likely follows the concurring opinion in Walton. In fact, the Fifth Circuit's 1983 jurisprudence is markedly different from our own circuits. They don't recognize, for example, the danger creation doctrine, which they recently reiterated just a few months ago. But in Walton, the concurrence said, no, there is, in fact, a special relationship created in the circumstance. But we don't find that the dean acted with deliberate indifference. So even their best case doesn't stand for the proposition that would preclude a finding of special relationship here. I think most importantly, of course, on summary judgment, you have to ask whether in light of the evidence viewed most favorably to the non-moving party, there are disputes of material fact that should go to a jury. So whether or not they exercise daily control of her life such that, under Ducheney, it would be considered a, quote, similar restraint of her personal liberty, is a question that should go to the jury. If you read through Judge Kuhnhauer's opinion, what he simply does is say, six circuits have considered this, none of them have found it. If you actually read through those opinions, of course, you find that that isn't the case. Not only did the Trisky case not find that in the Third Circuit, but in the Eighth Circuit, where a teen committed suicide in a voluntarily admitted program, the court actually reversed summary judgment for the defendant and said, no, we need to send this back and examine whether what was initially a voluntary placement became an involuntary custody or control situation. And in that circumstance, they said, we doubt, quote, whether or not this program, the state, would actually have allowed this person to leave, given her condition. Last thing I would add on that point, and this isn't disputed, and sort of strangely, Judge Kuhnhauer acknowledges this, but it's of no moment to him in his analysis, that under Washington law, a finding of a person being gravely disabled in a voluntary program is sufficient basis upon which the state can detain and hold that person. He alludes to the fact that maybe even the capacity of the state to control this person's liberty would suffice. And he acknowledges that Washington law allows it. And he seems to notice the sort of synchronicity between the definition of gravely disabled there and incapacitation that was found in 1995 by a state court. And so it's certainly in play, and certainly plaintiff's position, that Justine has always been gravely disabled, was at the time gravely disabled. And under no circumstance would she be able to wake up in the morning and tell her caregivers, I'd like to just leave now. And they'd say, here you go. They paint this rather fictitious picture in their brief, that these are three residents, three women, sort of living in a college town, living together with some assistance from the state that comes in and helps out. That it's their home. If you imagine the actual facts on the ground of this woman, Justine, who suffered a life of severe seizures and borderline mental retardation. This is not her home. She never paid, and her family never paid for a dime of this home. She didn't put the locks on the door. She didn't get to pick up the phone and say, I want to go to the elder care program three days a week. That they make a lot out of in their briefs. As if she could wake up each day and decide where she wanted to go and just enjoy a free life running about town. That was all regulated by the state. The timing and the terms of her movements were controlled by the state. I think what also is important is that unlike circumstances where the state is not responsible for causing the injury to the person. Not responsible for the events that lead to any exposure, such as in the Monaghan case which is cited in the briefs. Where a mentally ill patient in a voluntary placement jumped out of a van during a transport, ran down an off ramp and was injured. That's not the circumstance here. This is not about what DeShaney focuses on, which is harm caused by third party actors. That the state may have, through their unreasonableness and deliberate indifference, allowed to occur. These are the state actors who caused the harm. They're the persons who were told and known for years. These people had worked Mitchell and McGinty. Doesn't that bleed over into your state created doctrine? The state created danger? There's an overlap in the doctrines, but obviously there's an important analytical difference. There's an earlier Ninth Circuit case, I think Ketchum, that seemed to blur the doctrines. But it was clear in 1989, which is two years later, that- Did you exhaust the state created danger doctrine in the district court? There was not a waiver. The argument here that there was is misplaced. First and foremost, in response to seven distinct arguments in summary judgment below, plaintiff responded in the district court in the introductory section of their brief. In the final paragraphs before leading into the summary of facts, which is a place typically that a council would place for sort of summarizing legal arguments. They explicitly evoked the language that was used, which I can quote from, where they said, in addition, and I'll read it. In addition, a reasonable jury could also conclude that defendants violated plaintiff's rights by placing Justine in an unreasonably dangerous situation. They cite to Ducheney, in city of Ridgefield, this circuit held, that Ducheney recognizes the danger creation exception, even if it's properly understood not to have created it. It recognizes it. So, council cited the seminal case on point, Ducheney. And from there, and certainly put that in play and put that in the record. Supreme Court precedent is clear. Parties are not limited to the precise arguments made below. It's also clear under USP Polaris and this circuit, that it is claims that are deemed waived, not arguments. There is not a clear bright line rule as to the distinction between issue and claim and whether there's deficiencies there. I would refer to Cold Mountain, which Your Honor, Judge Bybee was among the three judges on that panel. The difference, an important difference between this case and Cold Mountain, is that in Cold Mountain, you had a new claim for a violation. There, environmental groups claimed that the bison management plan was not appropriately sensitive to eagle habitats and other things. And they made an argument that the plan was adopted improperly. Then at the Court of Appeals, they made an additional argument that, in addition to the facts we've stated, three years later, you also made an error in failing to re-initiate contact with a forest service to re-evaluate things. This court held that was never placed in the record below, because that's a claim for a new violation of law. Here, the violation of law is the violation of her 14th Amendment, substantive due process rights. Defense comes in, I use the terms used below. Defense comes in with a Ducheney challenge. And exceptions to that challenge are articulated. Those are not new claims. So there was no waiver. Lastly, I would say there are three recognized exceptions, all delineated in Cold Mountain, to the waiver doctrine. The first of which is, the court will not recognize waiver when it would create a manifest injustice. I would submit to the court in this context, when the matter has been fully briefed, when the factual record is fully developed, which bleeds into the third exception to waiver, it would be a manifest injustice to deny Ms. Booth the opportunity to have her created this danger. We acknowledge the second exception does not apply. It's not about a change in law in the interim. But as to the third exception, probably the most powerful exception, the pertinent record is developed, parties have briefed the issue. And it cries out for recognition under danger creation. And I'd be happy to get into those, but the line of cases have seamlessly held, since would, and I'm happy to address Johnson, the one standing exception to that, that when the state creates a danger, that state actors are on notice. That if they create a danger to anyone, inside or outside of custody or control, they have an obligation to prevent that danger from causing harm. Here it did cause harm, more so than Munger, more so than in would. And this is not a law enforcement context where there's a concern about having to act quickly under the duress of competing interests and countervailing considerations. The interest that law enforcement has to consider. And those are legitimate. You don't have that here. These are workers who deliberate constantly about the care they're supposed to give. We're not asking for a categorical rule. We're asking the court to find under these facts that the district court erred, and that this case should go to a jury. Okay, thank you, Mr. Stevenson. Good morning, may it please the court. My name is Stu Estes, Special Assistant Attorney General for Defendants Mitchell and McGinty. At council table with me is Assistant Attorney General Andrew Loggerwell for Defendant Pate. We have decided to split our time. I'll take nine minutes to discuss some of the facts and the state created danger theory. And Mr. Loggerwell will spend six minutes on the voluntary custody issue. The voluntary custody issue from substantive due process was the only claim alleged in the trial court. The court properly dismissed it. We would ask this court to affirm that. State created danger, we believe, is waived. That's set forth in our brief, and I won't spend a whole lot of time. But we didn't address it in our reply. The district court didn't see it raised either. So we believe it's waived. Even if this court were to consider it, it should not be accepted. There's an alternative basis to affirm, which is qualified immunity. I'm going to allow Mr. Loggerwell to discuss most of the facts involved in custody. However, I would say that it's a gross overstatement of the case to say that she was a prisoner in this home. She came and went, largely as she pleased, supervised. She went to day camps. She went back and forth to her mother's house. She had different appointments that she kept. She traveled by herself on the access bus. She wanted to find out. She was on this access bus, which is a controlled bus, which transports all over our city persons who are disabled and not able to use public transportation. That's exactly right. It's King County Metro. And if they came up, the driver would help her into the bus and take her to her mother's house in Seattle, where she would at least twice a month visit with her mother, spend the night. There's a record that shows that. The letter says it was voluntary. And I think the law is very clear that unless the right to leave has been revoked, her act, her ability to stay in SOLA remained voluntary. She got the entire time. What was her IQ, counsel? It was low. I mean, she was functioning as a child. But as I'll get to in a moment, she was the highest-functioning adult in that home. And she basically could do a number of her activities of daily living unsupervised, just with prompting. She could walk. She could get around. She could brush her teeth and whatnot. But she had a lower mental functioning. That's not an issue. But she could not go anywhere that the supervisor didn't know about. She couldn't just go for a walk and not come home. Nor could a third grader at Greenwood Elementary School, which all the courts have considered mandatory school attendance not to be involuntary custody, doesn't have those indicia. The fact that there are some restrictions on your freedom does not convert it into involuntary custody akin to incarceration. And again, I'm stepping on Mr. Lagerwell's toes a little bit. But I'm happy to answer those questions. To turn to the state-created danger theory, again, at page 41 in our brief, we recite why it's been waived. As to the question of prejudice, it really affects plaintiffs in a more significant matter than us. They didn't raise the issue. So they didn't put facts in the record that would allow you to find a genuine issue of material fact. There's not a fact question here. Nor would the law support any of their alleged facts. The danger creation theory, and I understand that there's at least three substantive due process claims on this Court's docket this morning. So I won't belabor the legal issues too much. But in our particular context, the general rule is there's no liability on the state actors unless there's either involuntary custody or danger creation. Danger creation involves an affirmative act by the state, not the failure to act. And plaintiff, the central allegation in this case is my clients failed to act, resulting in Justine Booth's drowning. Was it carelessness? Was it negligence? That's another question. The matter in this case, was it done with actual knowledge of excessive risk? Were they deliberately indifferent? Were they callous to the point of conscious shocking? Did they place Justine Booth in a more dangerous position than the one in which she would have been otherwise? Stated alternatively, did they create an opportunity that would not have existed in Justine Booth's life? What about telling her to go take a bath unattended? The record throughout the PSPs and personal service plans show a pattern throughout 10 years of Justine needed to be reminded to do things. Reminded in the morning to do something, reminded in the afternoon to do something. And as far as bathing, it's going back to her mental abilities, she needed prompting, she didn't need assistance. The record through LaShonda Mitchell's interview transcript shows clearly she was prompted, okay, McGinty says, Justine, it's time to take your bath. It's 8 o'clock, take your bath and get out and get your medication. She would go into the bathroom and say, Justine, you need to start bathing. I can hear you, you're not bathing. I walk in there, look, take the washcloth and start bathing. And as she liked the bath, as many people do, she liked to lounge in there. There were two other women in the house, she had to be reminded it's time to get out of the bath. So to say that she was forced against her will to take a bath is not accurate. She took a bath her entire life, the record goes back to at least 1991, saying that was her preferred method of personal hygiene. The record also shows that she was concerned about her appearance and hygiene, her clothing, her hair, and she liked to take the bath. She would have taken the bath anywhere. The record even indicates that at her mother's house, she would take a bath. Year 959, back in 1991, she went to her mother's house and she was taking a bath. Anyone would take a bath. Let me kind of change the subject. It's curious to me, let's say that in fact she was put in danger. Let's say that she was awarded the state. Who is to benefit from any award that is made? Apparently there's a real issue as to whether the mother has any guardianship rights. And if she did have guardianship rights, what would that entail in terms of awards for the death of her child? Who would actually receive the monies? Yes. Well, Ms. Campbell is suing directly. Usually we want to have someone who's capable or should be able to receive the award. The claim here is on behalf of Lorraine Campbell. The estate claims are no longer pending and that dismissal was not appealed. That's not before this court. So it's actually Ms. Campbell's constitutional right of familial association that she's bringing forward. So she's a direct claimant. The mother, you're saying? The mother. Yes. And so going back to the affirmative act, which creates the danger, like any person, personal hygiene is a mandatory part of our living. She would have taken a bath. There's no indication that she was dragged into the bathtub and forced to bathe. She did it, she would have done it anywhere outside the solo home or not. Who's in charge of qualified immunity, you or your colleague? I can discuss it as to state-created danger. I think Judge Kuhnhauer is right on the mark, is that it's in flux at best as far as the involuntary custody. But there hasn't been a case where- Therefore qualified immunity because not clearly established? Correct, yes. And in state-created danger, really there's been no case that says that the failure to act can be an act. And it's obviously counterintuitive. This court in the Mardi Gras riots case that happened in Seattle said that the Seattle Police Department's decision not to take a more aggressive action, to back off their initial plan and be passive while persons rioted and injured each other, was not an affirmative act, which created substantive due process liability. Are you arguing as well that qualified immunity would apply on the merits? That a reasonable person would not have known that it was not okay to leave her in her bathtub by herself? There was no constitutional notice to my clients that there was a right that was clearly established anywhere. Right, but apart from the right, what about the merits? Would a reasonable person have known that it was not okay to leave her in her bathtub by herself? Perhaps as far as negligence, as far as something of a constitutional moment, that they were deliberately indifferent. And I just want to talk to the facts, which may answer your question in a better manner, you do have a handout, which is ER 965, which I've modified only to the extent that the bathtub on the right-hand side is highlighted, and the couch on which LaShonda Mitchell was sitting, 16 to 20 feet away. And this is to scale, done by the Sheriff's Department investigator. That shows where they were sitting. They moved, this is a private lease, and as the District Court found, these women, whether they had the contractual ability to do so or not, signed the lease. This is not something the state procures houses for. This is a private residence. They lost the lease on the last house. They moved to this one. It was smaller. They no longer used the baby monitor because they were right down the hallway. It's a straight shot here. They could hear everything that was going on in the bathtub. And so they did not need the monitor. And also, the record is replete with indications of Justine's seizures as being physically violent. She'd be sitting in a chair, and LaShonda Mitchell described them as the oh Jesus seizures, because that's what Justine would be yelling. It was clear when they would happen. Counsel, you're beyond the time that you wanted to reserve for co-counsel. I didn't know if you were watching your clock. I am, your honor. Just, I leave with the point that Mitchell and McGinty were there, as counsel indicated, for about five years supervising Justine. It's upwards of a thousand different bathing supervisions without any incident. Their medication had been adjusted, making it less likely that she would have a seizure. There's nothing even approaching deliberate indifference, particularly with the Supreme Court's loss of this kind of shocking behavior. So thank you. Thank you. Counsel, your honors, may it please the court, my name is Andrew Loggerall. I'm an assistant attorney general, and I represent Sonia Pate in this case. We ask this court to affirm the court below, because Ms. Booth was never in state custody. During the entire time that she participated in the voluntary SOLA program, she was merely a recipient of state services individually tailored to both her personal and her medical needs. Ms. Pate, my client, and the state had neither the legal authority to keep Ms. Booth in a residential setting against her will, nor in fact have they ever tried to.  Liability has always said you must have custody. The key focus, though, is not- What would happen if Justine had said one morning, I'm just going out on my own, what would have happened? Likely the two attendant counselors would have attempted to redirect her in a way that saw to her safety, care, and maintenance. Would she have been allowed to leave? Potentially, yes. The only- Not potentially, let's talk actually. I think given the charge of care that the attendant counselor managers have within the individual house, they would have done everything within their power to redirect her in a way that saw to her safety. If they felt that her leaving was not a threat to her individual safety, they would have allowed it. If they didn't, and this is the only way that you can restrain somebody in the state of Washington in a residential setting, they could have temporarily restrained her just long enough to let the designated county's mental health official see if she posed an imminent threat to herself or others. Under the revised code of Washington, Chapter 11, it is actually illegal, and the state does not have the power to ever detain somebody involuntarily in a residential setting, such as the Solihouse, nor do the Washington courts. After age two or three, she was never out on her own, ever. She was in complete state custody until she was 18, and then she was transferred to this program. At her mother's behest, that is correct. The important thing that the court remembers not to focus, as plaintiffs do almost exclusively in this case, on Mrs. Booth's impairments, nor on the state's efforts to help her manage those impairments in the least restrictive environment possible. As the trial court properly noted, safety, care, and maintenance cannot and do not equal custody. As this court noted in Lipscomb, the state's knowledge of the individual's predicament, or from its expression of intent to help her, but from the limitation which it has imposed on her freedom to act on her own behalf. I would at this point point out that it is an incorrect and a factually inaccurate statement to say that she was moved from house one to house two against Ms. Booth's intentions. What the record does reflect is that the mother didn't want her moved from the first house to the second house because it would put her daughter further away. It would make her eight miles or 20 miles away from her mother's home instead of eight miles. And her option at that point was to what? She couldn't have stayed where she was because they lost the lease. If the mother didn't want the daughter to live in Kent, she would have had to take her out of the program. Withdraw her from the program, correct. Put her into some more restrictive program perhaps. Correct, correct. They could have, I suppose they could have either put her in a private facility or re-institutionalized her if she felt that that was the preferred method of care for her daughter at that time. Or taken her home to live with her. Right, and she did none of those things. There's actually nothing contemporaneous with the move that reflects her protestations. The only time that showed up was in her declaration on summary judgment. As I noted earlier, the state has neither the power nor in this case is there the factual backdrop to create custody. There is absolutely no disagreement that her original entrance into the program was voluntary. As I noted under the Revised Code of Washington, Chapter 11, it is illegal to detain somebody in a residential setting against their will. And actually, not even the courts can do so. What RCW 1192-190 says is that any court order that would purport to do so is null and void. I see I'm out of time, unless your honors have any further questions. Thank you, counsel. Mr. Stevenson, you used all of your time. I will give you a minute to respond to any arguments that you think that we need to be aware of. Thank you, your honor, just briefly. First, I would emphasize again that the reports from the state of Washington, those investigations, led to the termination of two state employees on the very basis that we make this claim here. They found, quote, abuse and, quote, neglect. And they fired them because they failed to save Justine from this danger. They created the danger, and they, quote, caused her death. And it's no small feat to fire and have the firing stand of a union protected state employee. It was virtually unprecedented, and unprecedented in this program. It is no small thing to have those firings stick. And to yank Ms. Pate, the supervisor, out of her job and send her into an administrative job, noting that she failed to establish safety protocols for this person. Secondly, silent seizures are well established in the record here, not just violent flat thrashing about seizures. I point the court to ER 267. The Johnson case is completely dissimilar. The persons there were partying late at night in a crowd. The police decided after two nights of exacerbating the violence in the crowd that they would pull back. Those persons chose to be in that crowd. The police didn't cause any of those acts. And the court was there correct to hold otherwise. Under even, Judge Bybee, your own four point test that you articulated in- Counselor, you're over time. I think we're aware of the Johnson case, but thank you very much. We thank counsel for the argument. Campbell is submitted.
judges: Wilken, Fletcher B. , Bybee